**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| MATTHEW KENDALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 12-CV-140-GKF-PJC |
| | ) | |
| TURN-KEY SPECIALISTS, INC., | ) | |
| and JAMES T. LEWELLEN, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Before the court is the Rule 12(b)(2) Motion to Dismiss Complaint for Lack of Personal

Jurisdiction [Dkt. #8] filed by defendants Turn-Key Specialists, Inc. ("TSI"), and James T.

Lewellen ("Lewellen").  Defendants assert the court lacks general or specific personal

jurisdiction over them.

### I. Facts

### A. Allegations of the Complaint

Plaintiff Matthew Kendall ("Kendall"), a resident of Oklahoma, sued TSI, a Texas

corporation, and Lewellen, a Texas resident, for breach of contract.  [Dkt. #2, Complaint].  He

alleges on May 29, 2011, he entered into a binding letter agreement ("Letter Agreement") with

Lewellen, individually, and TSI, for the acquisition of the assets of TSI and certain agreed upon

liabilities effective June 30, 2011.  [*Id.*, ¶¶5-6].  At the time, Lewellen owned the majority of the

stock of TSI, and subsequently, he acquired and owns 100% of the stock of TSI.  [*Id.*, ¶7].

Kendall alleges that in reliance on the Letter Agreement, he and Lewellen agreed to allow a third

party selected by Kendall to begin working in management for TSI and Kendall paid half of the

third party's compensation.  [*Id.,* ¶8].  He also alleges he rendered services to TSI in contemplation of the closing, and he and the third party added substantial value to TSI, from which TSI and Lewellen benefited.  [*Id.,* ¶9].  He alleges that, as contemplated by the Letter Agreement, he had a "Definitive Agreement" prepared and provided to TSI and Lewellen for review and comment, to which neither defendant responded. [*Id.,* ¶11].  He contends he fully performed all obligations of the Letter Agreement and all conditions precedent to the closing were either satisfied or waived by Kendall.  [*Id.,* ¶¶16-17].  Kendall alleges he was fully prepared to close the transactions contemplated under the Letter Agreement by the targeted closing date of August 1, 2011, and made multiple demands on defendants that they close the transaction, but defendants delayed the closing and, in violation of the Letter Agreement, stopped providing current information about TSI requested by him. [*Id.,* ¶¶18-22].  Kendall alleges he sent defendants letters demanding a closing on October 25, 2011 and December 23, 2011, but defendants breached the Letter Agreement by failing to close the sale, failing to use commercially reasonable best efforts to close the sale, failing to provide current information about TI and/or by taking actions prohibited by the Letter Agreement without Kendall's consent. [*Id.,* ¶¶23, 25-26].  He seeks specific performance of the Letter Agreement and lost profits derived from and/or the diminution in value of, the assets from June 30, 2011, to the date that assets are transferred to him, or in the alternative, the value of the assets as a going concern, which is estimated to be between $2 million and $20 million.  [*Id.*, ¶27].  He also seeks damages for other direct losses, including additional expenses incurred in attempting to close the transaction.  [*Id.,* ¶28].

## B. Affidavit of Lewellen, Individually

Lewellen is a resident of Houston, Texas, and has been at all times material to this action. [Dkt. #8, Ex. A]. He has not been in Oklahoma since 2008. [*Id.*]. His presence then was as an employee of TSI. [*Id.*]. He has never owned or leased real or personal property in Oklahoma, never owned a business licensed in Oklahoma or otherwise related to Oklahoma, never had a bank account or telephone in Oklahoma, never been employed in Oklahoma, nor employed an Oklahoma resident, and never been sued in Oklahoma. [*Id.*].

Lewellen states that, regarding the Letter Agreement, plaintiff initiated contact with him regarding the purchase of his stock in TSI, and the initial contact occurred in Houston. [*Id.*]. In his personal capacity, he never delivered documentation regarding TSI to plaintiff in Oklahoma, and has never delivered correspondence to plaintiff in Oklahoma. [*Id.*]. He executed the Letter Agreement in The Woodlands, Texas, and the Letter Agreement was to be funded in Houston. [*Id.*]. In his personal capacity, Lewellen has no right to sell the assets and liabilities of TSI. [*Id.*].

## C. Affidavit of Lewellen as President of TSI

Lewellyn, at all times material to this case, was President of TSI. [Dkt. #8, Ex. B]. TSI is a corporation licensed and existing under the laws of the State of Texas, with its principal— and only—place of business at Two Eldridge Place, 757 North Eldridge Road, Suite 550, Houston, Texas, 77079. [*Id.*]. TSI has no registered or unregistered agent for service of process in Oklahoma; TSI has never owned or leased real or personal property in Oklahoma; never had a bank account or telephone in Oklahoma; never employed an Oklahoma resident; never paid taxes in Oklahoma; and never before been sued in Oklahoma. [*Id.*]

Lewellen avers that TSI does not conduct business in Oklahoma; the last time it conducted any business in Oklahoma was 2008, after which TSI purposefully stopped conducting business in the state.  [*Id.*].  TSI is not licensed to conduct business in Oklahoma, nor does it own, lease or control property in Oklahoma.  [*Id.*].  TSI does not maintain employees, offices, agents or bank accounts in Oklahoma; none of its shareholders reside in Oklahoma; TSI does not advertise or otherwise solicit business in Oklahoma; does not travel to Oklahoma by way of salesperson or other representatives, does not pay taxes in Oklahoma; does not visit potential customers in Oklahoma; does not recruit employees in Oklahoma; and does not generate sales or income through revenue generated from Oklahoma customers.  [*Id.*].

TSI is properly capitalized and maintains books and records separate and apart from Lewellen personally.  [*Id.*].  Its finances are kept separate from Lewellen's individual finances; TSI does not pay Lewellen's individual obligations and Lewellen does not pay TSI obligations.  [*Id.*].  TSI follows all corporate formalities.  [*Id.*].

With respect to the Letter Agreement, plaintiff initiated contact with Lewellen regarding the purchase of his stock in TSI.  [*Id.*].  The initial contact took place in Houston.  [*Id.*].  Plaintiff conducted meetings at TSI's offices in Houston regarding his purchase of the assets and liabilities of TSI; plaintiff's bankers reviewed all records requested of TSI at TSI's offices in Houston; the third party selected by plaintiff conducted due diligence on TSI at TSI's offices in Houston.  [*Id.*].

TSI's Board of Directors, sitting in Texas, conducted a telephone conference with plaintiff and his legal counsel, Mark Allen ("Allen").  During the telephone conference, TSI's directors advised plaintiff and Allen that any offers regarding the sale of TSI and/or its assets and liabilities would need to be presented to an reviewed and approved by the directors.   [*Id.*].

4

Plaintiff and Allen agreed to this. [*Id.*]. Lewellen alleges the agreement between TSI's directors and plaintiff was made in Texas. [*Id.*].

Lewellen, as president of TSI, executed the Letter Agreement in The Woodlands, Texas, and the Letter Agreement was to be funded in Houston. [*Id.*]. Lewellyn states, "As President of TSI, I had no intention whatsoever of purposefully avail[ing] TSI of the privilege of conducting activities or consummating a transaction in Oklahoma" and "my only intention was to consummate a transaction in the State of Texas." [*Id.*].

### D. Affidavit of Kendall

Kendall avers that he first heard of TSI and Lewellen in November of 2010, when a business acquaintance, Glen Rector, contacted him and told him Lewellen of TSI was interested in hiring Kendall's firm, Imperium Solutions, LLC ("Imperium"), as a contractor for a job TSI needed assistance on. [Dkt. #11, Ex. A, ¶5]. Kendall emailed Lewellen a brochure regarding Imperium, and called Lewellen to introduce himself and Imperium. [*Id.*]. He told Lewellen Imperium was in Broken Arrow, Oklahoma and the email and brochure he sent Lewellen clearly show Imperium is based in Broken Arrow. [*Id.*]. Over the next couple of weeks, Lewellen and Kendall called each other regarding the possible week. [*Id.,* ¶6]. Eventually Lewellen called Kendall in Tulsa and told him that TSI would not do work with the end user. [*Id.*].

Around December 15, 2010, Rector contacted Kendall and asked if he would have any interest in purchasing TSI, as Lewellen had told him he was going to sell the company and was looking for buyers. [*Id.,* ¶7]. Kendall told Rector he was interested but would needed to seek financial information on the company. [*Id.*]. On December 22, 2010, Lewellen sent an email to Rector telling him he would provide the information once a confidentiality agreement was signed, and Rector forwarded the email to Kendall. [*Id.,* ¶8 and Ex. 2 to Ex. A]. Thereafter,

Lewellen and Kendall exchanged texts, seven of which were sent by Lewellen to Kendall.  [*Id.,* ¶9].  On January 10, 2011, Kendall sent Lewellen and Rector an email about the confidentiality agreement and Lewellen replied to the email.  [*Id.,* ¶10 and Exs. 3 and 4 to Ex. A].  On January 13, 2011, Lewellen sent Kendall financial information about TSI by email, and in the following months Lewellen and/or representatives of Lewellen and/or TSI sent emails transmitting financial and other detailed information of TSI to Kendall and/or Rector and/or Kendall's representatives.  [*Id.,* ¶¶11-12].  Lewellen sent emails to Kendall or to Rector to be transmitted to Kendall regarding the potential purchase, and also sent texts to Kendall.  [*Id.,* ¶13].  During discussions regarding the potential purchase, Kendall told Lewellen he planned to open an office in Oklahoma that would handle a lot of the administrative duties, and would be critical to his growth strategy and to marketing in Oklahoma.  [*Id.,* ¶14].  He states that Lewellen told him TSI had a strong history of doing work in Oklahoma and a strong relationship with Oklahoma-based companies.  [*Id.*].  Kendall checked to see if TSI was registered to provide engineering services in Texas and Oklahoma, and discovered it was not registered in Oklahoma but was in Texas.  In Kendall's opinion, TSI should have been registered in Oklahoma because it had provided engineering services in Oklahoma.  [*Id.,* ¶15].

On March 11, 2011, at Lewellen's suggestion, a conference call among Kendall and his attorney, Allen, in Tulsa and Lewellen and his advisors in Houston occurred.  [*Id.,* ¶16].  Additionally, while the parties were negotiating the Letter Agreement, Lewellen contacted Kendall in Tulsa by telephone several times to discuss its terms. [*Id.,* ¶17].  On May 26, 2011, Kendall sent the Letter Agreement to Lewellen.  [*Id.,* ¶18].  On May 27, 2011, Lewellen signed

the Letter Agreement, individually and as president a majority owner of TSI, and delivered it to Rector to transmit to Kendall in Oklahoma.  [*Id.,* ¶¶20-21].[1]

After the Letter Agreement was signed, there were numerous communications between Kendall and Lewellen and their representatives, including many emails and phone calls that were originated by Lewellen and directed at Kendall and/or Allen in Oklahoma.  [*Id.,* ¶24].  Lewellen offered multiple times to go by Kendall's office in Broken Arrow or Allen's office, indicating he had to travel to visit with Williams and/or AG Equipment anyway so this was not an inconvenience.  [*Id.,* ¶25].

On July 13, 2011, Kendall, Allen and two representatives from Kendall's Oklahoma based bank flew to Houston and met with Lewellen and other TSI key management. Both before and during the meeting, Kendall explained to Lewellen that the Oklahoma based bank would be providing, at a minimum, a continuing working capital revolver for the new company after the transaction was complete and all bank accounts would be at the bank.  [*Id.,* ¶27].

TSI records provided during due diligence reflect that TSI has done business with the following entities which are based, and/or have had operations, in Oklahoma:

a. Flint Energy Services, Inc., in 2005;
b. Ozark Gas Transmission (Atlas Pipeline Mid-Continent, LLC) from 2007 through early 2009;
c. Elk City Oklahoma Pipeline in 2008;
d. Devon in 2007; and
e. Williams or its subsidiaries, affiliates and related entities several years through 2011.

---

[1] The Letter Agreement provided for the sale by TSI of its assets and liabilities to Kendall for a purchase price of $600,000. [Dkt. #11, Ex. 6 to Kendall Affid.].  With respect to Lewellen, the Agreement stated, "It is anticipated that you will continue to serve the Company upon such terms and conditions as are mutually acceptable to the parties, with your principle duties to include continuing to serve for two (2) years as the Vice President of Sales for Key Accounts…" [*Id.,* Agreement, ¶3.a.]. Additionally, the Agreement included a noncompete agreement with respect to Lewellen. [*Id.*].

[*Id.,* ¶28 and Ex. 7 to Ex. A].  In 2008, TSI did more than $13 million of work for companies that were in Oklahoma or based in Oklahoma; in 2009, 2010 and the first half of 2011, TSI had revenues of $1,229,978, $205,983 and $955,257 respectively from such companies.  [*Id.,* ¶29 and Ex. 7 to Ex. A].  A 1999 post on a TSI website references two projects done by TSI for Central Oklahoma Oil & Gas Corporation in Konowa and Stewart, Oklahoma.  [*Id.,* ¶31 and Ex. 8 to Ex. A].  Kendall states, "It is believed that the work for Atlas Pipeline Mid-Continent…and Williams…was obtained through Lewellen's contacts with Ron Obee, who worked for both companies in addition to other Oklahoma based companies and upon information and belief lived and worked in the Tulsa area."  [*Id.,* ¶33].

Kendall states that, based on the TSI records made available to him, he is aware that TSI retained the services of and was billed by several Oklahoma companies, including Imperium in 2011; Quarter Turn Resources from 2005 through 2008 and in 2011; Industrial Pipe & Specialists, Inc. of Tulsa in 2008; and ACS Manufacturing, Inc. of Oklahoma City in 2006 and 2007.  TSI ordered product from John Zink between 1999 and 2008. [*Id.,* ¶34].

### E. Affidavit of Glen Rector

Rector met Lewellen in the spring of 2009 when Rector was employed at Atmos Energy in the Energy Development group.  [Dkt. #11, Ex. B, Rector Affid., ¶2].  In the spring of 2010, Rector told Lewellen he would be laid off by Atmos at the end of May; Lewellen asked Rector if he would consider becoming TSI's president.  [*Id.,* ¶3]. Rector stopped by TSI's offices on November 16, 2010, and Lewellen raised the possibility of Rector becoming TSI's president. [*Id.,* ¶4].  In follow-up conversations Lewellen talked about some work that TSI needed done, and Rector suggested Kendall and his company, Imperium, might be able to do the work. Lewellen asked Rector to have Kendall and Imperium contact him as soon as possible.  [*Id.,* ¶5].

In December of 2010, Lewellen told Rector that his brother had died the preceding summer and he had re-evaluated his situation and decided to sell TSI, and asked if Rector had any interest in purchasing it. [*Id.,* ¶7].  Rector told him he was not in the position to buy TSI but that Kendall might be interested.  [*Id.,* ¶8].  Lewellen asked him to contact Kendall to see if he was interested, and he did so. Kendall requested financial information about TSI, and Rector relayed the request to Lewellen.  [*Id.*].  On December 22, 2010, Lewellen sent Rector an email with the proposed confidentiality agreement to be signed by Kendall and Rector.  He forwarded the confidentiality agreement to Kendall.  [*Id.,* ¶9].  On May 27, 21011, Lewellen signed the Letter Agreement in front of Rector and gave Rector the signed agreement to send back to Kendall in Tulsa.  [*Id.,* ¶11].  During the summer of 2011, Rector worked for TSI pursuing the consummation of the transaction under the Letter Agreement and assisting in project work and management functions.  His salary was paid half by TSI and half by Kendall.  [*Id.,* ¶12].  During that period of time, there was an exchange of information between Lewellen in Houston and Kendall in Tulsa.  [*Id.,* ¶13].  In addition, Rector sent information regarding TSI to Kendall in Tulsa, keeping him appraised of what was happening at TSI.  Rector copied Lewellen on the emails.  Rector is aware that Lewellen and TSI's office manager provided information directly to Kendall during the entire period.  [*Id.,* ¶14].

### F. Affidavit of Mark H. Allen

Allen is an attorney with McAfee & Taft in Tulsa.  He served as the attorney for Kendall in connection with the negotiation and drafting of documents for the purchase of the assets and liabilities of TSI.  [Dkt. #11, Ex. C, Allen Affid., ¶¶1-2].  During his representation of Kendall, Allen had communications with attorneys and a certificated public accountant representing TSI and Lewellen.  [*Id.,* ¶3].  Allen and Kendall had a phone call with Lewellen and his advisors

regarding the transaction on March 11, 2011.  [*Id.,* ¶4].  Allen had phone calls with Lewellen and Dale Mellencamp, an attorney for TSI, on August 8, 16, 18, 22, and 25, 2011 and September 11, 2011; Allen received at least 20 emails from Mellencamp.  [*Id.,* ¶5].  Mellencamp sent Allen a CD with information about TSI.  [*Id.,* ¶6].

Allen had telephone conversations with Ed Nelson, an attorney representing Lewellen and TSI on September 7, 14 and 19, 2011 and October 4, 2011; Nelson sent him at least 14 emails.  [*Id.,* ¶7].  He had at least two telephone conversations with Raleigh Bales, Jr., the certified public accountant for TSI and/or Lewellen, and received four emails from him.  [*Id.,* ¶8].  The majority of the calls were initiated by representatives of TSI and Lewellen.  [*Id.,* ¶9].

Allen states that based on communications and documents provided, Lewellen owned the majority of the outstanding shares of TSI and at some point became the sole shareholder.  [*Id.,* ¶10].

### III. Applicable Law: Requirements for Personal Jurisdiction

In considering a motion to dismiss pursuant to Rule 12(b)(2), a court must determine whether the plaintiff has alleged sufficient facts to establish the court's personal jurisdiction over the defendant.  Plaintiff bears the burden of establishing that the court has personal jurisdiction over defendants.  *OMI Holdings, Inc. v. Royal Ins. Co. of Canada,* 149 F.3d 1086, 1091 (10th Cir. 1998); *AST Sports Science, Inc., v. CLF Dist. Ltd.*, 514 F.3d 1054, 1056 (10th Cir. 2008).  However, where, as here, the question of personal jurisdiction is disputed in the preliminary stages of litigation, "the plaintiff need only make a prima facie showing of jurisdiction to defeat the motion [to dismiss]."  *AST Sports Science,* 514 F.3d at 1056.  The plaintiff may make this prima facie showing by demonstrating, via affidavit or other written materials, facts that if true would support jurisdiction over the defendant.  *OMI Holdings,* 149 F.3d at 1091.  The court will

accept as true the allegations in plaintiff's complaint, and all factual disputes will be resolved in the plaintiff's favor. *Intercon Inc. v. Bell Atl. Internet Sol'ns*, 205 F.3d 1244, 1247 (10th Cir. 2000) (quoting *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995)).

"To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show that jurisdiction is legitimate under the laws of the forum state *and* that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment." *Far West Capital, Inc. v. Towne*, 46 F.3d 1071, 1074 (10th Cir. 1995). "In Oklahoma, this two-part inquiry collapses into a single due process analysis," because Oklahoma permits the exercise of personal jurisdiction to the full extent permitted by the United States Constitution. *Rambo v. American S. Ins. Co.*, 839 F.2d 1415, 1416 (10th Cir.1998) (citing Okla. Stat. tit. 12, § 2004 F). Accordingly, the only question remaining is whether the exercise of personal jurisdiction over the nonresident defendant comports with due process. *See AST Sports Science*, 514 F.3d at 1057.

The Due Process Clause prevents courts from exercising jurisdiction over a nonresident defendant unless "there exist 'minimum contacts' between the defendant and the forum state." *Benton v. Cameco Corp.*, 375 F.3d 1070, 1075 (10th Cir. 2004) (quoting *OMI Holdings,* 149 F.3d at 1091). The "minimum contacts" standard can be satisfied in either of two ways: First, the court may exert specific jurisdiction over a defendant who has "purposefully directed his activities at residents of the forum," provided "the litigation results from alleged injures that arise out of or relate to those activities." *Id.* (internal citations and quotation marks omitted). Alternatively, the court may maintain general personal jurisdiction over a defendant who has maintained continuous and systematic general business contacts with the forum state. *Id.*

### IV. Lewellen's Motion to Dismiss

Lewellen asserts the court has neither general nor specific personal jurisdiction over him. Additionally, he argues his only contacts with Oklahoma have been as a representative of TSI, and, as a result, the fiduciary shield doctrine precludes the exercise of personal jurisdiction over him.

### A. General Jurisdiction

Lewellen's contacts with Oklahoma are minimal.  He is a resident of Houston.  There is no evidence he has been in Oklahoma since 2008, when he traveled to the state on behalf of TSI. He has never owned or leased real or personal property in Oklahoma, never owned a business licensed in Oklahoma or otherwise related to Oklahoma, never had a bank account or telephone in Oklahoma, never been employed in Oklahoma, nor employed an Oklahoma resident, and never been sued in Oklahoma.  The court finds it does not have general personal jurisdiction over Lewellen.

### B. Specific Jurisdiction/Fiduciary Shield Doctrine

Lewellen had extensive email, text and telephone contact with Kendall concerning the Letter Agreement, and many of the communications were initiated by him.  However, he undertook those communications on behalf of TSI.

Under the fiduciary shield doctrine, exercise of personal jurisdiction over an individual may not be based solely on acts the individual performed in a purely representative capacity. *Home-Stake Production Company v. Talon Petroleum C.A.,* 907 F.2d 1012, 1017 (10th Cir. 1990).  "The underpinning of [the] fiduciary shield doctrine is the notion that it is unfair to force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer."

*Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 902 (2d Cir. 1981).  The doctrine is an

equitable one, and the determination of the appropriateness of its application requires an analysis

of the particular facts of a case.  *Id.* at 903.

> The Tenth Circuit has stated:
>
> Before a corporation's acts and obligations can be legally recognized as those of
> a particular person, and vice versa, it must be made to appear that the corporation
> is not only influenced and governed by that person, but that there is such a unity
> of interest and ownership that the individuality, or separateness, of such person
> and corporation has ceased, and that the facts are such that an adherence to the fiction
> of the separate existence of the corporation would, under particular circumstances,
> sanction a fraud or promote injustice.

*Ten Mile Industrial Park v. Western Plains Service Corp.*, 810 F.2d 1518, 1526-27 (10th Cir.

1987) (quotation and citations omitted).  Thus, "[w]here the acts of individual principals of a

corporation in the jurisdiction were carried out solely in the individuals' corporate or

representative capacity, the corporate structure will ordinarily insulate the individuals from the

court's jurisdiction."  *Id.* at1527.  (citations omitted).  "Jurisdiction over the representative of a

corporation may not be predicated on jurisdiction over the corporation itself, and jurisdiction

over the individual officers and directors must be based on their individual contacts with the

forum state."  *Id.*  The fiduciary shield doctrine "is not concerned with liability," but rather "is

concerned with jurisdiction, and specifically with the fairness of asserting jurisdiction over a

person who is acting solely in the interests of another."  *Home-Stake,* 907 F.2d at 1017-18

(quotation and citation omitted).

Where the corporation on whose behalf the defendant was allegedly acting is nothing

more than a "mere instrumentality" of the individual, the fiduciary shield doctrine will not

protect the individual from the court's exercise of personal jurisdiction.  *Id.* at 1018.

Additionally, some courts have found that a defendant acting in the capacity of a corporate

employee may be subject to personal jurisdiction based on the corporation's contacts if the employee was instrumental in perpetrating fraud against the plaintiff.  *See Labadie v. Protec Fuel Management, LLC*, 2011 WL 43088, **7-8 (N.D. Okla. Jan. 4, 2011); *Jayhawk Capital Management, LLC v. LSB Indus., Inc.,* 2009 WL 3766371, *19 (D. Kan. Nov. 10, 2009); *Shotwell v. Crocs Retail, Inc.,* 2007 WL 2446579, *3 (N.D. Okla. Aug. 23, 2007);  *All American Car Wash, Inc. v. National Pride Equipment, Inc.,* 550 F. Supp. 166, 169-70 (W.D. Okla. 1981). However, the individual's contacts with the state must have been in connection with the wrong complained of by plaintiff.  *See, i.e., All American Car Wash,* 550 F. Supp. at 170 (court found it had personal jurisdiction over individual defendant in lawsuit for alleged unfair business practices, where individual defendant made numerous trips to Oklahoma in connection with corporate defendant's lowering of its price per wash cycle—the alleged unfair business practice).

Plaintiff has sued defendants for breach of the Letter Agreement.  It is true, as plaintiff asserts, that Lewellen signed the Letter Agreement both individually and on behalf of TSI, and the Letter Agreement identified him as a "key employee" and provided for his retention for two years.  However, the principal purpose of the Agreement was the sale of TSI's assets and liabilities to plaintiff, and not Lewellen's continued services.  Further, the injury alleged by plaintiff is TSI's failure to consummate the asset sale rather than the loss of Lewellen's services as a key employee.

Lewellen's affidavits establish that all acts he undertook with respect to the Letter Agreement were in his capacity as an employee of TSI, and that, in his personal capacity, he has no right to sell the assets and liabilities of the company.  TSI is properly capitalized, maintains books and records separate from Lewellen's individual obligations and follows all corporate formalities.  TSI does not pay Lewellen's individual obligations and Lewellen does not pay

TSI's obligations.  Further, plaintiff has made no allegations of fraud or unfair business practices on the part of TSI or Lewellen.

The court concludes that Lewellen did not, on his own behalf, purposefully avail himself of the privilege of conducting activities or consummating a transaction in the forum state. Instead, his activities were taken on behalf of his employer, TSI.   Thus, the court finds that the corporate shield doctrine precludes assertion of personal jurisdiction over Lewellen.

## IV. TSI's Motion to Dismiss

TSI asserts the court lacks either general or specific personal jurisdiction over it.

## A. General Jurisdiction

Because general jurisdiction does not involve contacts with the forum state directly related to the lawsuit, "courts impose a more stringent minimum contacts test, requiring the plaintiff to demonstrate the defendant's 'continuous and systematic general business contacts'" with the forum state. *OMI Holdings, Inc.*, 149 F.3d at 109 (citation and quotation marks omitted).  When evaluating whether a defendant has established general contacts with a particular forum, courts have considered, among other things, the following twelve factors: (1) Whether the defendant conducts business in the state; (2) whether the defendant is licensed to conduct business in the state; (3) whether the defendant owns, leases, or controls property or assets in the state; (4) whether the defendant maintains employees, offices, agents, or bank accounts in the state; (5) whether the defendant's shareholders reside in the state; (6) whether the defendant maintains phone or fax listings in the state; (7) whether the defendant advertises or otherwise solicits business in the state; (8) whether the defendant travels to the state by way of salespersons or other representatives; (9) whether the defendant pays taxes in the state; (10) whether the defendant visits potential customers in the state; (11) whether the defendant recruits

employees in the state; and (12) whether the defendant generates a substantial portion of its national sales or income through revenue generated from in-state customers. *Soma Med. Int'l. v. Standard Chartered Bank*, 196 F.3d 1292, 1295-96 (10th Cir. 1999) (quoting *Buddensick v. Stateline Hotel, Inc.*, 972 P.2d 928, 930-31 (Utah Ct. App. 1998)); *see also Smith v. Basin Park Hotel, Inc.*, 178 F. Supp. 2d 1225, 1231 (N.D. Okla. 2001).

TSI meets few of these factors.  TSI is a Texas corporation with its only office in Houston.  It is not licensed to conduct business in the state.  It has no registered agent in Oklahoma; has never owned or leased real or personal property in Oklahoma; and has no employees, offices, agents, bank accounts or telephones in the state.  It has never paid taxes in Oklahoma and never before been sued in Oklahoma.  Kendall *has* submitted evidence that between 2005 to 2011, TSI conducted business with several Oklahoma companies, that during the same period, TSI has retained the services of several Oklahoma companies; that TSI has, in the past, bought product from an Oklahoma company; and that Lewellen, on behalf of TSI, has called upon customers in Oklahoma prior to 2009.  However, there is no evidence concerning what percentage of TSI's total sales or income the Oklahoma work comprised.

The court concludes plaintiff has failed to demonstrate "continuous and systematic general business contacts" between TSI and Oklahoma sufficient to confer general jurisdiction over TSI.

### B. Specific Jurisdiction

The specific jurisdiction inquiry is a two-step process.  Under the first step, the court must determine whether the defendant has "purposefully directed his activities at residents of the forum" and whether "the litigation results from the alleged injuries that arise out of or relate to those activities." *Benton v. Cameco Corp.,* 375 F.3d at 1075 (quoting *OMI Holdings,* 149 F.3d

at 1092). If the first step is satisfied, the court must then consider whether the exercise of personal jurisdiction offends traditional notions of fair play and substantial justice." *Pro Axess, Inc. v. Orluz Distribution, Inc.,* 428 F.3d 1270, 1276-77 (10th Cir. 2005).  "This latter inquiry requires a determination of whether the district court's exercise of personal jurisdiction over a defendant with minimum contacts is 'reasonable' in light of the circumstances surrounding the case." *OMI Holdings*, 149 F.3d at 1091.

In a contract case, such as this one, the court should consider "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *AST Sports Science,* 514 F.3d at 1058 (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 479 (1985)).

TSI contends Kendall initiated negotiations for the asset purchase. It asserts it had no intention of purposefully availing itself of the privilege of conducting activities or consummating a transaction in the State of Oklahoma, and its only intention was to consummate a transaction in the State of Texas.  However, Kendall and Rector testified TSI asked Rector to contact Kendall about the potential acquisition.  Kendall further testified that after Rector initially asked him if he would be interested in acquiring TSI, Kendall and Lewellen exchanged numerous emails and texts, many of which were sent by Lewellen to Kendall in Oklahoma; and Lewellen emailed financial information about TSI to Kendall.  Lewellen and other TSI representatives telephoned Kendall and his advisors in Tulsa several times to discuss terms of the sale.  Kendall informed Lewellen that his future plans for TSI after the purchase included opening an office in Oklahoma, and that legal representation would be located in Tulsa.

Accepting as true Kendall's version of the negotiations between the parties, the court finds TSI purposefully availed itself of the privilege of conducting activities or consummating a

transaction in the forum state and that the litigation results from alleged injuries that arise out of or relate to those activities.

The court must also determine whether the exercise of personal jurisdiction over TSI is reasonable in light of the circumstances surrounding the case. *Omni Holdings,* 149 F.3d at 1091. The court must consider five factors to resolve whether the exercise of personal jurisdiction would be reasonable:  (1) the burden on the defendant; (2) the forum state's interest in resolving the dispute; (3) the plaintiff's interest in receiving convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental social policies. *Id.* at 1095.  Since the court has determined there have been minimum contacts, "the burden is on the defendant to present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Rusakiewicz v. Lowe,* 556 F.3d 1095 1102 (10th Cir. 2009). However, the reasonableness prong of the due process inquiry "evokes a sliding scale." *Pro Axess,* 428 F.3d at 1280 (citing *Ticketmaster-New York, Inc. v. Alioto,* 26 F.3d 201, 210 (1st Cir. 1994)).  The strength of the five factors "sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts that would otherwise be required," and "[c]onversely, the factors may be so weak that even though minimum contacts are present, subjecting the defendant to jurisdiction in that forum would offend due process." *OMI Holdings,* 149 F.3d at 1095-96.

### Burden on Defendant

With respect to the first factor, "[t]he burden on the defendant of litigating the case in a foreign forum is of primary concern in determining the reasonableness of personal jurisdiction." *OMI Holdings*, 149 F.3d at 1096.  However, "modern transportation and communication have

made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity." *Pro Axess, Inc.,* 428 F.3d at 1280 (citing *Burger King,* 471 U.S. at 474). Thus, although forcing TSI to litigate this dispute burdens it, the burden is not "gravely difficult and inconvenient." *Pro Axess, Inc.,* 428 F.3d at 1280 (citing *Burger King,* 472 U.S. at 478).  The court finds this factor is neutral.

### Forum State's Interest in Resolving Dispute

"States have an important interest in providing a forum in which their residents can seek redress for injuries caused by out-of-state actors." *OMI Holdings,* 149 F.3d at 1096.  However, the forum state has a reduced interest in providing a forum for dispute resolution when the forum state's law will not be applied.  *See Sleepy Lagoon, Ltd. v. Tower Group, Inc.,* 809 Fed.Supp.2d 1300, 1310 (N.D. Okla. 2011) (citing *OMI Holdings,* 149 F.3d at 1096). The court finds this factor is neutral.

### Plaintiff's Interest in Receiving Convenient and Effective Relief

"The third step in [the] reasonableness inquiry hinges on whether the [p]laintiff may receive convenient and effective relief in another forum," and "[t]his factor may weigh heavily in cases where a [p]laintiff's chances of recovery will be greatly diminished by forcing him to litigate in another forum because of that forum's laws or because the burden may be so overwhelming as to practically foreclose pursuit of the lawsuit." *OMI Holdings,* 149 F.3d at 1097.  Plaintiff has made no showing his chances of recovery in a Texas court will be diminished either because of the forum's laws or because the burden is so overwhelming as to practically foreclose pursuit of the case.  However, litigation in this forum would be more convenient for him.  The court finds this factor favors, to some extent, exercise of jurisdiction.

**Interstate Judicial System's Interest in Obtaining Efficient Resolution**

The fourth factor—the interstate judicial system's interest in obtaining the most efficient resolution of controversies—requires inquiry into the location of witnesses, where the wrong underlying the lawsuit occurred, what forum's substantive law governs the case, and whether jurisdiction is necessary to prevent piecemeal litigation." *Omni Holdings,* 149 F.3d at 1097. Key witnesses are located in both Oklahoma (Kendall and Allen) and Houston (Lewellen and Rector).  TSI asserts the alleged wrong occurred in Houston, where it is located, and Kendall contends it occurred in this jurisdiction.  Texas law governs the Letter Agreement.  Furthermore, because the court has determined it lacks personal jurisdiction over Lewellen, there is a potential for piecemeal litigation.  The court finds the fourth factor weighs somewhat against this court's exercise of personal jurisdiction.

**States' Interest in Furthering Fundamental Substantive Social Policies**

The court's analysis of the fifth factor focuses on the interests of Texas and the forum state in advancing fundamental substantive social policies.  *See OMI Holdings,* 149 F.3d at 1097. Neither party has identified any substantive social policy interests that might be implicated by the exercise of jurisdiction and the court finds that the social policy of any state will not be affected by whether this case is heard in Oklahoma or Texas.

In conclusion, three of the factors—the burden on the defendant, the forum state's interest in resolving the dispute and the respective states' interest in furthering fundamental substantive social policies—are neutral.  The third factor—the plaintiff's interest in receiving convenient and effective relief—favors exercise of jurisdiction.  The fourth factor—the interstate judicial system's interest in obtaining the most efficient resolution of controversies—favors resolution of the dispute in Texas courts.  TSI has not satisfied its burden of presenting a

20

"compelling case" of other considerations that render jurisdiction unreasonable.  *See Rusakiewicz,* 556 F.3d at 1102. Therefore, the court finds that the exercise of personal jurisdiction over TSI is reasonable in light of the circumstances surrounding the case.

### VI. Conclusion

For the reasons set forth above, defendants' Motion to Dismiss Complaint for Lack of Personal Jurisdiction [Dkt. #8] is granted with respect to defendant Lewellen and denied with respect to defendant TSI.

ENTERED this 28th day of November, 2012.

GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT